UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SCOTT ROSEAN ODUM,

                Petitioner,

v.

                                      Case No. 22-cv-11982
                                      Honorable Linda V. Parker

JOHN CHRISTIANSEN,

                Respondent.

_____/

## OPINION AND ORDER DENYING THE HABEAS PETITION, DENYING A CERTIFICATE OF APPEALABILITY, AND DENYING LEAVE TO PROCEED IN FORMA PAUPERIS ON APPEAL

Petitioner Scott Odum, a pro se litigant currently incarcerated in Michigan, filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. (ECF No. 1.) On September 12, 2017, a jury convicted Mr. Odum of first-degree felony murder, Mich. Comp. Laws § 750.316(1)(b); armed robbery, Mich. Comp. Laws § 750.529; second-degree arson, Mich. Comp. Laws § 750.73(1); mutilation of a dead body, Mich. Comp. Laws § 750.160; and possession of a firearm during the commission of a felony, Mich. Comp. Laws § 750.227b. (ECF No. 6-19 at PageID.1600-05; ECF No. 5 at PageID.72-73.) Thereafter, in 2017, the Wayne County Circuit Court sentenced Mr. Odum to life in prison without parole on the murder conviction, concurrent terms of twenty to forty years in prison on the

robbery and arson convictions, a concurrent term of ten to twenty years on the

mutilation conviction, and a consecutive term of two years in prison on the felony

firearm conviction.  (ECF No. 5 at PageID.72-73; *see also* ECF No. 6-21 at

PageID.1620-21.)  The court sentenced Mr. Odum as a third habitual offender in

accordance with Mich. Comp. Laws § 769.11.  (ECF No. 6-21 at PageID.1620-21.)

In his habeas petition, Mr. Odum raises two claims of insufficient evidence.

(*See generally* ECF No. 1.)  Respondent has filed an answer to the amended habeas

petition contending that it should be denied for lack of merit.  (*See generally* ECF

No. 5.)   For the reasons set forth, the Court denies and dismisses with prejudice

the habeas petition, denies a certificate of appealability, and denies leave to

proceed in forma pauperis on appeal.

## I.    Facts and Procedural History

Mr. Odum's convictions arise from the robbery and murder of Gabriel

Vasquez and a subsequent arson to burn the evidence of the crimes in Detroit,

Michigan in 2016.  (*Id*. at PageID.72.)  Mr. Odum was tried with co-defendant

Lamonn Knott before separate juries, whereby both were convicted of the

foregoing offenses.  (ECF No. 1 at PageID.8.)  The Michigan Court of Appeals

described the relevant facts, which are presumed correct on federal habeas review,

*see* § 2254(e)(1); *Wagner v. Smith*, 581 F.3d 410, 413 (6th Cir. 2009), as follows:

> On April 7, 2016, Knott contacted the victim about purchasing a large
> amount of marijuana.  Knott and the victim spoke by cellular telephone

several times throughout the day, and Rachel Karas, the victim's girlfriend, testified that the victim left their shared home during the evening hours to meet Knott to complete the sale. The victim took with him nearly $12,000 in cash, several pounds of marijuana, and a wristwatch when he left. Cellular telephone tower tracking showed that the victim was heading toward 9558 Ward Street, an area in which Knott's cellular telephone also was pinging. The last conversation the victim had on his cellular telephone was at 6:21 p.m., during which he called Knott. After hanging up, Knott immediately called Odum six consecutive times before Odum finally answered on the seventh call. Odum's cellular telephone also pinged the sector of the tower covering the crime scene. The cellular records then showed that for about one hour neither Knott's, Odum's, nor the victim's cellular telephones connected to a tower. Special Agent Stan Brue, who was qualified to testify as an expert witness in the field, stated that this likely indicated that all three telephones were powered off.

About one hour after the telephones stopped connecting to any tower, security camera footage from a Citgo gas station just a few blocks from 9558 Ward Street showed Knott and Odum walking toward the store. They entered the gas station, got in line, and began a conversation. During that conversation, Knott and Odum gestured toward an area behind the cash register where the gas station kept the gas cans it sold. Initially, Odum purchased a pack of cigarettes and walked out of the store with Knott, but then they stopped, spoke for a moment, and Knott walked back into the gas station. Odum continued across the street, toward a liquor store and 9558 Ward Street. Knott, once back inside the gas station, purchased two gas cans. He then took those gas cans outside to a pump and filled them with gasoline. Afterward, Knott walked away in the same direction as Odum.

About 35 minutes after Knott left the gas station, a 911 call reported a fire at 9558 Ward Street. The victim's body was discovered inside the home by the fire department. He had been shot a total of five times, twice in the face, twice in the head, and once in the chest. His body and some of the house also had been burned. The arson investigator concluded that the fire was started in multiple locations with the use of an accelerant. Two gas cans were found in the kitchen of the house at 9558 Ward Street. Those gas cans were the same brand and model as those purchased by Knott from the Citgo gas station.

On May 26, 2016, police officers arrested Knott and Odum.  During his interview, Knott denied ever being in the area of the crime on the day in question.  He refused to admit that he was the man in the gas station surveillance footage and said that he did not know Odum.  Initially, Odum also denied being in the area of the crime on the day in question, but when presented with the gas station footage, he immediately admitted that it was him and Knott.  Odum stated that he had known Knott since childhood.  Odum continuously changed his story to police as he was confronted with more evidence against him.  Ultimately, Odum and Knott were tried together before separate juries, convicted, and sentenced as noted.

*People v. Odum*, No. 341969, 2020 WL 1170813, at *2 (Mich. Ct. App. Mar. 10, 2020).

Following his convictions and sentencing, Mr. Odum filed an appeal of right in the Michigan Court of Appeals raising several claims, including the claims presented on habeas review.  *Id*. at *2.  The court affirmed his convictions, but remanded the case to the trial court for clarification of a sentencing issue.  *Id*. at *22.  Mr. Odum also filed an application for leave to appeal in the Michigan Supreme Court raising the claims presented on habeas review, which was denied in a standard order "because [the court was] not persuaded that the questions presented should be reviewed by [it]."  *People v. Odum*, 959 N.W.2d 515, 515 (Mich. 2021).

Mr. Odum thereafter filed this federal habeas petition raising the following claims:

4

1.  His rights to due process were violated because his convictions for first-degree felony murder, armed robbery, felony firearm, mutilation of a dead body, and second-degree arson were based upon insufficient evidence that he was an accomplice to those crimes.

2.  There was insufficient evidence to prove his conviction for second-degree arson because the property burned was not a dwelling as required by MCL 750.73(1).

(*See* ECF No. 1 at PageID.15-24.)

## II.    Standard of Review

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), codified at 28 U.S.C. § 2241 *et seq*., sets forth the standard of review that federal courts must use when considering habeas petitions brought by prisoners challenging their state court convictions and sentences.  The AEDPA provides in relevant part:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

§ 2254(d)(1)-(2).

The Supreme Court holds that

> [a] state court's decision is "contrary to" . . . clearly established law if it "applies a rule that contradicts the governing law set forth in [Supreme Court] cases" or if it "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [that] precedent."

*Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003) (per curiam) (quoting *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000)); *see also Bell v. Cone*, 535 U.S. 685, 694 (2002) (holding that the issuance of a writ under the "contrary to" clause is appropriate when the state court deviates from the Supreme Court by applying a different rule or arriving at a decision different from the Supreme Court on a case with similar facts).

"[T]he 'unreasonable application' prong of § 2254(d)(1) permits a federal habeas court to 'grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts' of petitioner's case." *Wiggins v. Smith*, 539 U.S. 510, 520 (2003) (quoting *Williams*, 529 U.S. at 413); *see also Bell*, 535 U.S. at 694 (explaining that an "unreasonable application" occurs when a state court "correctly identifies the governing legal principle . . . but unreasonably applies it to the facts of the particular case"). To find a state court's application of Supreme Court precedent unreasonable, the state court's decision "must have been more than incorrect or erroneous. The state court's application must have been 'objectively

unreasonable.'" *Wiggins*, 539 U.S. at 520-21 (citations omitted); *see also*
*Williams*, 529 U.S. at 409.

The "AEDPA thus imposes a 'highly deferential standard for evaluating
state-court rulings,' and 'demands that state-court decisions be given the benefit of
the doubt.'" *Renico v. Lett*, 559 U.S. 766, 773 (2010) (quoting *Lindh v. Murphy*,
521 U.S. 320, 333 n.7 (1997)); *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per
curiam)). "A state court's determination that a claim lacks merit precludes federal
habeas relief so long as 'fairminded jurists could disagree' on the correctness of the
state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (citing
*Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). The Supreme Court
emphasizes that "even a strong case for relief does not mean the state court's
contrary conclusion was unreasonable." *Id*. at 102 (citing *Lockyer v. Andrade*, 538
U.S. 63, 75 (2003)). Pursuant to § 2254(d), a habeas court "must determine what
arguments or theories supported or . . . could have supported, the state court's
decision; and then it must ask whether it is possible fairminded jurists could
disagree that those arguments or theories are inconsistent with the holding in a
prior decision" of the Supreme Court. *Id*.

Therefore, to obtain federal habeas relief, a state prisoner must show that the
state court's denial of a claim "was so lacking in justification that there was an
error well understood and comprehended in existing law beyond any possibility for

fairminded disagreement." *Id.* at 103; *see also White v. Woodall*, 572 U.S. 415, 419-20 (2014) (reiterating the same).  Federal courts "are required to afford state courts due respect by overturning their decisions only when there could be no reasonable dispute that they were wrong." *Woods v. Donald*, 575 U.S. 312, 316 (2015).  A petitioner cannot prevail so long as it is within the "realm of possibility" that fairminded jurists could find the state court decision reasonable. *Woods v. Etherton*, 578 U.S. 113, 118 (2016).

Section 2254(d)(1) limits a federal habeas court's review to determining whether the state court's decision comports with clearly established federal law as determined by the Supreme Court at the time the state court renders its decision. *Williams*, 529 U.S. at 412.  Section 2254(d) "does not require a state court to give reasons before its decision can be deemed to have been 'adjudicated on the merits.'" *Harrington*, 562 U.S. at 100.  Furthermore, it "does not require citation of [Supreme Court] cases–indeed, it does not even require *awareness* of [Supreme Court] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early v. Packer*, 537 U.S. 3, 8 (2002); *Mitchell*, 540 U.S. at 16.

In other words, the requirements of clearly established law are determined solely by Supreme Court precedent.  Circuit precedent "does not constitute 'clearly established federal law as determined by the Supreme Court'" and cannot provide

8

a basis for federal habeas relief. *See Knowles v. Mirzayance*, 556 U.S. 111, 121-22 (2009) (explaining that the standard of review requires application of Supreme Court precedent, not legal rules that have been established by lower courts); *Parker v. Matthews*, 567 U.S. 37, 48 (2012) (per curiam) (holding that "[t]he Sixth Circuit . . . erred by consulting its own precedents, rather than those of [the Supreme] Court, in assessing the reasonableness of the [state court's] decision"); *Lopez v. Smith*, 574 U.S. 1, 2 (2014) (per curiam) (emphasizing that AEDPA "prohibits the federal courts of appeals from relying on their own precedent to conclude that a particular constitutional principle is 'clearly established'"). Lower federal court decisions, however, may be useful in "assessing the reasonableness of a state court's" ruling. *Stewart v. Erwin*, 503 F.3d 488, 493 (6th Cir. 2007) (citing *Williams v. Bowersox*, 340 F.3d 667, 671 (8th Cir. 2003)).

As stated, a state court's factual determinations are presumed correct on federal habeas review. *See* § 2254(e)(1); *Wagner*, 581 F.3d at 413 (relying on the facts as described by the Michigan Court of Appeals). A petitioner may however rebut this presumption with clear and convincing evidence. *Warren v. Smith*, 161 F.3d 358, 360-61 (6th Cir. 1998). Furthermore, habeas review is also "limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).

### III.    Analysis

9

## A. Insufficient Evidence Claim Regarding Acting as An Accomplice

Mr. Odum first asserts that he is entitled to habeas relief because the prosecution failed to present sufficient evidence to prove that he acted as an accomplice to, or aided and abetted, Mr. Knott so as to support his convictions. (ECF No. 1 at PageID.15-22.)  Mr. Odum does not challenge the underlying elements of the crimes, but rather focuses on the evidence of his identity as one of the perpetrators.  (*Id*.)  Respondent contends that this claim lacks merit because there is strong circumstantial evidence indicating otherwise.  (ECF No. 5 at PageID.88, 92-106.)

The Due Process Clause of the Fourteenth Amendment "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged."  *In re Winship*, 397 U.S. 358, 364 (1970).  "[T]he relevant question is whether after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).  The sufficiency of the evidence "standard must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law," *id*. at 324 n.16, and through the framework of § 2254(d), *Martin v. Mitchell*, 280 F.3d 594, 617 (6th Cir. 2002).  Thus, challenges to the sufficiency of the evidence under the AEDPA must survive

10

"two layers of deference to groups who might view facts differently than [a reviewing court] would" on habeas review–the factfinder at trial and the state court on appellate review–as long as those determinations are reasonable.  *Brown v. Konteh*, 567 F.3d 191, 205 (6th Cir. 2009).

Additionally, "it is the responsibility of the jury–not the court–to decide what conclusions should be drawn from the evidence admitted at trial."  *Cavazos v. Smith*, 565 U.S. 1, 2 (2011) (per curiam).  A federal habeas court may not re-weigh the evidence or re-determine the credibility of witnesses.  *Marshall v. Lonberger*, 459 U.S. 422, 434 (1983) ("28 U.S.C. § 2254(d) gives federal habeas courts no license to redetermine credibility of witnesses whose demeanor has been observed by the state trial court, but not by them."); *Matthews v. Abramajtys*, 319 F.3d 780, 788 (6th Cir. 2003) ("An assessment of the credibility of witnesses is generally beyond the scope of federal habeas review of sufficiency of evidence claims.")  Rather, a federal habeas court must defer to the factfinder at trial for its assessment of the credibility of witnesses.  *See Matthews*, 319 F.3d at 788.

Under Michigan law, in any criminal case, the prosecution must prove beyond a reasonable doubt that the defendant committed the charged offense.  *People v. Kern*, 149 N.W.2d 216, 218 (Mich. Ct. App. 1967).  Direct or circumstantial evidence and reasonable inferences arising from that evidence may constitute satisfactory proof of the elements of an offense, *see People v. Jolly*, 502

11

N.W.2d 177, 180 (Mich. 1993), including the identity of the perpetrator, *see Kern*, 149 N.W.2d at 218; *People v. Johnson*, 381 N.W.2d 740, 742 (Mich. Ct. App. 1985), and the defendant's intent or state of mind, *see People v. Dumas*, 563 N.W.2d 31, 34 (Mich. 1997); *People v. Nowack*, 614 N.W.2d 78, 83 (Mich. 2000). To add, a perpetrator's identity can be established by evidence that is entirely "circumstantial and sometimes requires reliance on an inference founded on an inference . . . ." *People v. Bass*, 893 N.W.2d 140, 156 (Mich. Ct. App. 2016).

To convict a defendant under an aiding and abetting theory, a prosecutor must prove that:

> (1) the crime charged was committed by the defendant or some other person, (2) the defendant performed acts or gave encouragement that assisted the commission of the crime, and (3) the defendant intended the commission of the crime or had knowledge that the principal intended its commission at the time he gave aid and encouragement.

*People v. Moore*, 679 N.W.2d 41, 49 (2004) (quoting *People v. Carines*, 597 N.W.2d 130, 135 (Mich. 1999)); Mich. Comp. Laws § 767.39.  The prosecution must also present sufficient evidence to prove the aider and abettor's state of mind, which "may be inferred from all the facts and circumstances, including a close association between the defendant and the principal, the defendant's participation in the planning or execution of the crime, and evidence of flight after the crime." *Carines*, 597 N.W.2d at 135.

Mr. Odum raised this claim on direct appeal. *See Odum*, 2020 WL 1170813, at *2. Applying the foregoing principles, the Michigan Court of Appeals denied relief on the claim. *Id*. at *7. The court explained in relevant part:

> [D]efendants do not dispute that the victim was robbed, murdered by someone who possessed a gun and shot him, and then partially burned in a dwelling. Rather, they merely argue that there was a lack of evidence that they were the ones who committed those crimes.
>
> ***
>
> ### 1. EVIDENCE OF KNOTT'S IDENTITY
>
> Knott's argument on appeal focuses on the lack of direct evidence that he was the person who committed the robbery, murder, and subsequent burning of the victim. As noted, however, identification of a defendant as the one who committed a crime can be established solely by circumstantial evidence. In this case, the prosecution presented an abundance of circumstantial evidence that Knott committed the crimes in question. Knott admitted in his interview with police that he knew the victim for many years. Knott acknowledged that, at some point in the past, he and the victim worked together selling marijuana. On the day in question, Karas saw that Knott called the victim. She believed that Knott requested to purchase marijuana, which comports with Knott's own description of his relationship with the victim. Similarly, Justin Covent, the victim's friend, knew that the victim and Knott were sometimes in business together, and that on the day in question, the victim was seeking marijuana to sell to Knott. Both Karas and Covent understood that when the victim left their presence, he was on his way to meet Knott.
>
> Knott's and the victim's cellular telephone records further confirm that the two were speaking on the day of the crime. The records show that they spoke on numerous occasions between 4:00 p.m. and 6:21 p.m. Those same records also place Knott in the area of the crime scene beginning at 5:53 p.m., and show that the victim was traveling toward the crime scene at least by 5:56 p.m., because his cellular telephone pinged a tower between his home and the scene of the crime. According to the cellular telephone records, the victim continued to move toward the crime scene, because at 6:08 p.m., his phone pinged a

tower even closer to the crime scene. For that call, the victim spoke with Knott, who again was in the vicinity of the crime scene. Following that conversation, Knott then called Odum six times in a row, all of which went to voicemail. When Knott finally reached Odum, both of their cellular telephones pinged the tower in the area covering the crime scene. Shortly thereafter, at 6:21 p.m., the victim called Knott a final time, during which the victim's cellular telephone pinged the tower immediately next to the crime scene, and Knott's cellular telephone pinged the tower for the crime scene. From that evidence, a reasonable juror could infer that Knott had contacted the victim, asked the victim to meet him on Ward Street in Detroit, and then enlisted Odum's help to eventually rob and murder the victim.

Agent Brue testified that the evidence indicated that all three cellular telephones were pinging off of towers near the crime scene and then likely were powered off. Thus, the evidence supported the inference that the three men were together because their phones were all pinging near the same location, and then all had their telephones powered off. Accordingly, Knott had the opportunity to commit the crimes and evidence of opportunity is logically relevant in a prosecution for murder.

The circumstantial evidence supporting those inferences was further bolstered by the gas station surveillance camera footage. The footage showed that at about 7:17 p.m., Knott and Odum arrived at a Citgo gas station located just a few blocks from the scene of the crime. They arrived on foot, walked into the store, and pointed toward an area behind the cash register where gas cans were sold. Odum then purchased cigarettes and walked outside and off toward the crime scene. Knott went back into the store, purchased two gas cans, went outside to a pump, filled those gas cans with gasoline, and then walked off in the same direction as Odum. After about 35 minutes, someone called the police regarding a fire at the scene of the crime. When police and firefighters arrived to investigate, the victim's body was found. He had been shot five times, his front left pants pocket had been turned out, his wristwatch was missing, there was no marijuana or cash in the house, and his body had been partially burned. The police also found two gas cans in the kitchen of the partially burned residence. Police investigation later determined that those gas cans were the same brand that was sold at the Citgo gas station. The arson inspector determined

14

that the fire was set on purpose, one of the sites of origin was the victim's body, and that an accelerant—gasoline—was used.

Later, during a conversation with Karas, Knott acknowledged that he planned to meet with the victim on the day of the crime, but stated that the victim did not show up.  Then, during his police interview, Knott denied being in the area of the crime and claimed that he had not spoken to the victim since March.  His representations to police contradicted his Facebook conversation with Karas.  Also, during his interview, Knott refused to identify himself in the gas station surveillance footage, only agreeing that the man looked like him.  Yet, about one year after the crime, in March 2017, Knott told a private investigator hired for his defense that the gas cans he purchased in the surveillance footage were in a garage owned by his family on Glastonbury Street in Detroit. Therefore, Knott tacitly admitted to being the man in the video despite repeatedly denying it and claiming he was nowhere near the area of the crime scene on the day in question.  Conflicting statements tend to show a consciousness of guilt, and a jury may infer consciousness of guilt from evidence of lying or deception.

In summary, Knott knew the victim, purchased and sold drugs with the victim in the past, was in contact with the victim on the day of the crime, was the last person to speak to the victim, was in the same vicinity as the victim, had his cellular telephone turned off at the same time as the victim, purchased gas cans and gasoline near the scene of the crime less than an hour before a fire was reported, lied about being in the area of the crime scene, and lied about being the man purchasing gas cans in the surveillance video. As noted, Knott's identity as the perpetrator could be established by evidence that is entirely circumstantial and sometimes requires reliance on an inference founded on an inference. Further, it is the function of the jury to make those inferences on the basis of the evidence presented, and it is not for [the court] to resolve anew.  The jury considered the evidence, circumstantial though it might have been, and determined that Knott was the person who lured the victim to the house on Ward Street, robbed him, killed him by shooting him five times, and then attempted to burn his body and the house by using the gasoline he purchased just down the street.  As established, those inferences by the jury were supported by Knott's clear opportunity to commit the crimes and the fact that he lied about his whereabouts and his identity in the surveillance video.

Accordingly, the inferences made by the jury in establishing Knott's guilt were well-founded. There was abundant circumstantial evidence that supported Knott's identity as the perpetrator of the crimes in question because it is for the trier of fact, not the appellate court, to determine what inferences may be fairly drawn from the evidence and to determine the weight to be accorded those inferences.

## 2. EVIDENCE OF ODUM'S IDENTITY

As argued by the prosecution, Odum was convicted on an aiding and abetting theory. Every person concerned in the commission of an offense, whether he directly commits the act constituting the offense or procures, counsels, aids, or abets in its commission may hereafter be prosecuted, indicted, tried and on conviction shall be punished as if he had directly committed such offense. The phrase "aids or abets" is used to describe any type of assistance given to the perpetrator of a crime by words or deeds that are intended to encourage, support, or incite the commission of that crime.

Odum's role in the case is directly connected to Knott's actions, which were just discussed in detail. Knott spoke with the victim several times during the day, and the cellular tower data revealed that the victim was traveling toward the crime scene at approximately 6:00 p.m. When the victim and Knott spoke for the last time at 6:21 p.m., Knott's cellular telephone was pinging the tower for the crime scene and the victim's cellular telephone was pinging the tower directly next to the scene. Within moments of finishing that call, in the span of just two minutes, Knott called Odum six times in a row. Odum finally answered on the seventh call, and the two had a short conversation during which both of their cellular telephones pinged the tower for the crime scene. As discussed, a reasonable juror could infer that Knott was luring the victim to the house on Ward Street on the premise of conducting a marijuana sale, when he actually intended to rob and kill the victim.

Similarly, a reasonable juror considering Odum's case could have inferred that Knott called Odum so that the two could prepare for the victim's arrival. This inference is supported by the timing of the call, considering that Knott would need to inform Odum that the victim was nearly at the house on Ward Street, given that the victim's cellular

16

telephone pinged a tower next to the scene.  The jury also could infer that Knott's attempts to contact Odum were urgent because he called him seven straight times within the span of just two minutes.  The urgent matter, a reasonable juror might infer, was the plan to rob and kill the victim, whom Knott knew was carrying a combination of cash and a large amount of marijuana.

Although, as noted by both defendants, the cellular tower data cannot definitively place Odum and Knott together or at the exact scene of the crime, a juror could reasonably infer that they were together at the time the crime occurred.  Joe Osborne III, who lived on Ward Street at the time of the crime, gave a statement to police that he saw two men at the scene of the crime at about the time the crime occurred.  Considering the abundant circumstantial evidence establishing that at least one of those men was Knott, lying in wait for the victim's arrival, a reasonable juror could infer that the second man was Odum on the basis of his cellular tower pings and his contact with Knott.  Despite Osborne's trial testimony that he could not identify either defendant, [the court] must assume that the jury made all credibility determinations in favor of the prosecution.

A reasonable juror also could infer that Knott and Odum were together shortly after they spoke on the telephone at about 6:23 p.m., because they appear on camera together at the Citgo gas station beginning at about 7:17 p.m.  They arrived together walking from the direction of the crime scene.  It was reasonable to infer that because they spoke on the telephone, both of their cellular telephones pinged the same tower, and they arrived at the Citgo gas station together, that they had been together from 6:23 p.m. onward.

The circumstantial evidence provided by the prosecution not only allowed for an inference that Knott and Odum were together, but that they committed the crime together.  On the basis of the same evidence previously noted, the jury was permitted to infer that Odum spoke with Knott about the victim's imminent arrival at the house on Ward Street and their intent to rob and kill him.  The circumstantial evidence also suggested that Odum went to the Citgo gas station to assist Knott in covering up the crime after it already was committed.  Although Odum argues that the Citgo footage only shows him purchasing cigarettes and not gas cans, the footage also shows Odum and Knott talking while in

17

the gas station and pointing behind the counter toward the area where gas cans are kept. Despite the fact that Odum left the gas station before Knott purchased and filled the gas cans, Odum did walk off toward the crime scene, and as is visible on the cameras, he appears to have walked past the liquor store across the street. Then, when Knott finished filling up the gas cans, he carried them off in the same direction that Odum went—toward the crime scene.

In considering that evidence, the jury reasonably inferred that Odum and Knott were working together to burn the house on Ward Street and the victim's body. When a person participates in actions performed to cover up a crime after it was committed, a jury is permitted to infer that the person aided and abetted the commission of that crime. Thus, Odum's clear involvement in the cover up of the crimes—going to the gas station with Knott to buy gas cans and gasoline—was evidence that he also participated in the crimes. Moreover, the purchase of the gas cans, which the jury was well-supported in inferring were the same gas cans found in the kitchen of the house on Ward Street, indicates that Odum was involved in burning the house—second-degree arson—and the victim's corpse—mutilation of a dead body.

Additionally, Odum repeatedly lied during his interview with police officers, lending further support to those inferences. The jury saw the interview video, and in it, Odum first denied that he was in the area of the crime scene on the day in question and that he was with Knott. Rather, Odum recalled that he was helping a friend move to an area that was not near the crime scene or the Citgo gas station. When the police presented him with the photographs from the Citgo surveillance cameras, Odum acknowledged that the men in the video were him and Knott. When informed by police that the video was taken at the time Odum was allegedly moving his friend, Odum began to change his story. For the first time, he said that he had to pick up another friend to help move and that friend lived near the scene of the crime. When the police pressed Odum on why he walked to the gas station with Knott, Odum changed his story again. This time, he said that he had met Knott at a local Family Dollar store because Knott had called him about his vehicle running out of gas. He stated that he and Knott then walked to the Citgo to get gasoline for Knott's car. Despite that testimony, Odum still claimed that he also moved his friend that same day and left the area shortly after the gas station footage ended. When presented with

the cellular tower data which indicated that his cellular telephone was pinging the tower nearest the crime scene until well after 8:00 p.m., Odum was unable to explain the discrepancy. In sum, Odum continued to change his story to a version that was most beneficial to him as he was presented with more evidence of his involvement in the crimes. Conflicting statements tend to show a consciousness of guilt and a jury may infer consciousness of guilt from evidence of lying or deception.

Finally, the prosecution presented evidence that, within 35 minutes of Knott leaving the Citgo station with cans of gasoline and walking in the same direction as Odum, someone called police regarding the fire at the crime scene. A reasonable juror could infer that Knott and Odum went back to the crime scene—their cellular telephones were still pinging in that area after the fire was called in—and worked together to burn the house and the victim's body. In sum, on the basis of the significant circumstantial evidence presented, the inference of a guilty conscience from Odum's lies to police, the cellular telephone analysis, the video footage showing Odum and Knott gesturing to the gas cans and the purchase of gasoline, and our requirement to construe all evidence in the light most favorable to the prosecution, the jury had sufficient evidence to find beyond a reasonable doubt that Odum aided and abetted Knott's commission of all of the crimes for which Odum was convicted.

*Id*. at *5-7 (text, brackets, citations, and quotation marks omitted).

The state court's denial of relief is neither contrary to Supreme Court precedent nor an unreasonable application of federal law or the facts. The prosecution presented sufficient evidence to support Mr. Odum's convictions as an accomplice. First, as Mr. Odum concedes, the prosecution presented sufficient evidence to establish that the victim was shot to death during an armed robbery and that his body was burned in the house afterward and to establish that co-defendant

19

Mr. Knott was the principal perpetrator of the crimes.  (ECF No. 1 at PageID.17-18.)

Second, the prosecution presented sufficient evidence that Mr. Odum aided and abetted Mr. Knott.  The prosecution's evidence included the cellphone evidence and related testimony that: placed Mr. Odum near the crime scene, indicated that Mr. Knott and Mr. Odum were in contact as the victim approached the area (six unanswered calls and one answered call from Mr. Knott to Mr. Odum over a four-minute period), and showed that Mr. Knott and Mr. Odum powered down their cellphones at the time of the murder.  The evidence also included the gas station video showing that the two were together near the time of the crime when Mr. Knott purchased gas cans of the same brand and model found at the burned house about forty-five minutes before the house fire was reported.  Lastly, the evidence consisted of Mr. Odum's own police statements in which he lied about his whereabouts and changed his story.   His inconsistent statements demonstrate consciousness of guilt.  *See, e.g.*, *Ricks v. Deangelo*, No. 19-cv-10387, 2022 WL 841321, at *5 (E.D. Mich. March 21, 2022) ("The jury also could have inferred consciousness of guilt from [the habeas petitioner's] deceptive conduct and false statement about his identify."); *Thomson v. Skipper*, No. 19-cv-11089, 2020 WL 4368083, at *4 (E.D. Mich. July 20, 2020) (holding that lying and deception may be evidence of consciousness of guilt).

While the evidence of Mr. Odum's guilt is circumstantial, and certainly not overwhelming, when considered in a light most favorable to the prosecution, it is sufficient to support a determination that he aided and abetted Mr. Knott in committing the crimes.

Mr. Odum challenges the jury's evaluation of the testimony and the evidence presented at trial. (ECF No. 1 at PageID. 21-22.) However, it is the job of the fact finder at trial, not a federal habeas court, to resolve evidentiary conflicts. *Jackson*, 443 U.S. at 326; *see also Walker v. Engle*, 703 F.2d 959, 970 (6th Cir. 1983) ("A federal habeas corpus court faced with a record of historical facts that supports conflicting inferences must presume–even if it does not affirmatively appear in the record–that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution."). The jury's verdict and the Michigan Court of Appeals' decision affirming that verdict were reasonable. Therefore, habeas relief is not warranted on this claim.

## B. Insufficient Evidence Claim Regarding the Dwelling

Mr. Odum next asserts that he is entitled to habeas relief because the prosecutor failed to present sufficient evidence that the structure that was burned was a dwelling as defined by the applicable Michigan statute. (ECF No. 1 at PageID.22-24.) Respondent contends that this claim lacks merit because the "state appellate court reasonably rejected" the argument. (ECF No. 5 at PageID.106.)

21

As discussed above, the relevant question for an insufficient evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson*, 443 U.S. at 318-19. To reiterate, this standard "must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law," *id*. at 324 n.16, and through the framework of § 2254(d), *Martin*, 280 F.3d at 617. Furthermore, "it is the responsibility of the jury–not the court–to decide what conclusions should be drawn from the evidence admitted at trial." *Cavazos*, 565 U.S. at 2. A federal habeas court does not have the authority to re-weigh the evidence or re-determine the credibility of the witnesses. *Marshall*, 459 U.S. at 434 ("28 U.S.C. § 2254(d) gives federal habeas courts no license to redetermine credibility of witnesses whose demeanor has been observed by the state trial court, but not by them."); *Matthews*, 319 F.3d at 788 ("An assessment of the credibility of witnesses is generally beyond the scope of federal habeas review of sufficiency of evidence claims.").

Mr. Odum raised this claim on direct appeal. *See Odum*, 2020 WL 1170813, at *2. The Michigan Court of Appeals applied the foregoing standards and thereby denied relief on the claim. (*Id*. at *10.) There, the court explained in relevant part:

> The elements of second-degree arson are governed by MCL 750.73(1):
> A person who willfully or maliciously burns, damages, or destroys by

22

fire or explosive a dwelling, regardless of whether it is occupied, unoccupied, or vacant at the time of the fire or explosion, or its contents, is guilty of second degree arson. To commit second degree arson, the person need not own the dwelling or its contents. A dwelling is defined to include but is not limited to, any building, structure, vehicle, watercraft, or trailer adapted for human habitation that was actually lived in or reasonably could have been lived in at the time of the fire.

In accordance with the elements of the offense and the definition of dwelling, the trial court instructed the jury that a dwelling house is a structure that was actually being lived in or that reasonably could have been lived in at the time of the fire. The fire investigator testified that entry to the front door of the home was obstructed by the victim's body. There was smoke throughout the home, and the strong odor of gasoline was present. Two gas cans were found in the kitchen area. The fire investigator identified multiple locations on the first floor of the home where items were burned that included the kitchen, dining room, living room, bedroom, and common hallway. However, he opined that the fire started at or on the victim's body. The fire investigator noted that electricity was not supplied to the home at the time of his inspection. Neighbor Osborne opined that the home was abandoned, and to his knowledge, there was no one staying in the home. Yet, this neighbor also testified that, for the last ten years, he had resided in the home across the street that had also been abandoned.

In addition to this testimony, the jury was presented with photographs of the interior of the home after the fire department responded. The photographs of the kitchen, the area where the two gas cans were discovered, depict a complete state of disarray with cabinet drawers strewn about the floor. However, the photographs do not establish whether the condition was in a pre-existing state of disarray or whether responding firefighters created the condition when putting out the fire in that location. Although the living room photograph also depicts items on the floor, there are visible walkways, a couch, and shelving units with trinkets. Furthermore, it is unclear what items were resting on the floor or caused to be placed on the floor in the process of extinguishing the fire.

For purposes of second-degree arson, the prosecutor had to demonstrate to the jury that the malicious burning of a dwelling occurred, and

dwelling includes a building that was actually lived in or reasonably could have been lived in at the time of the fire.  When the term "reasonable" is not defined in the law, it is a question of fact for the jury; and the court cannot take it from the jury by assuming to decide it as a question of law, without confounding the respective provinces of the court and jury.

In light of the testimony from the fire investigator and the photographs, the issue of whether the home constituted a structure that was actually being lived in or that reasonably could have been lived in at the time of the fire to satisfy the dwelling requirement of second degree arson presented an issue for resolution by the trier of fact.  Indeed, it was an essential element of the offense.  Defendant Odum had an absolute right to have the jury render its determination and a judge should not disturb this jury finding despite an inclination to reach a different conclusion. The jury was reposed with the determination regarding whether this home was actually lived in or reasonably could have been lived in at the time of the fire, and it chose to conclude that the home constituted a dwelling for purposes of second-degree arson.  The photographs, no matter how conclusive or compelling to an appellate court, cannot remove the fundamental constitutional right to have the jury render a decision on all essential elements of the offense.  The jury verdict cannot be repudiated by [the court's] substitution of its judgment for the jury's determination of questions of fact and application to the law. The fundamental right to a jury trial requires proof of guilt beyond a reasonable doubt of all elements of the offense, and we cannot remove the dwelling issue from the jury's determination in violation of this right.  A conclusion to the contrary addresses the dwelling element as a matter of law.  Moreover, resolution of this issue solely on the photographs is misplaced.  The photographs merely depict the end of the story—the condition of the home following the efforts of firefighters to extinguish a fire.  The jury had to decide whether the home reasonably could have been lived in before the fire, and we cannot remove that constitutional delegation of that authority from its purview. Under the circumstances, there was sufficient evidence for the jury to convict both Odum and Knott of second-degree arson.

*Id.* at *9-10 (text, brackets, citations, and quotation marks omitted).

24

The state court's decision is neither contrary to Supreme Court precedent nor an unreasonable application of federal law or the facts.  The photographic evidence and the trial testimony indicating that the crime occurred in an "abandoned" house with a door and enclosed walls containing a kitchen, a dining room, a living room, a bedroom, and a hallway and had cabinets, furniture, and knick-knacks on the shelves, viewed in a light favorable to the prosecution, was sufficient for the jury to conclude that the structure constituted a dwelling under Michigan law.  The fact that the house was in disarray–whether due to disuse, vandalism, or the firefighters' actions–or lacked electricity does not mean that a person could not have reasonably lived there at the time of the crime.  Moreover, the fact that the house was "abandoned" or uninhabited is irrelevant given that the arson statute explicitly provides that a structure need not be occupied to be considered a dwelling.  *See* Mich. Comp. Laws § 750.73(1).

Mr. Odum challenges the jury's evaluation of the evidence presented at trial. (ECF No. 1 at PageID.24.)  However, as previously discussed, it is the trial court fact finder's job to resolve evidentiary conflicts, not the federal habeas court.  *See Jackson*, 443 U.S. at 326; *see also Walker*, 703 F.2d at 970 ("A federal habeas corpus court faced with a record of historical facts that supports conflicting inferences must presume–even if it does not affirmatively appear in the record–that the trier of fact resolved any such conflicts in favor of the prosecution, and must

defer to that resolution.").  The jury's verdict and the Michigan Court of Appeals'
decision affirming that verdict were reasonable.  Thus, habeas relief is also not
warranted on this claim.

## IV.    Conclusion

For the reasons stated, the Court concludes that Mr. Odum is not entitled to
federal habeas relief on his claims.  Accordingly, the Court denies and dismisses
the petition for a writ of habeas corpus with prejudice.

Before Mr. Odum may appeal, a certificate of appealability must issue.  *See*
28 U.S.C. § 2253(c)(1)(a); Fed. R. App. P. 22(b).  A certificate of appealability may
issue only if a petitioner makes "a substantial showing of the denial of a
constitutional right."  § 2253(c)(2).  When a court denies relief on the merits, the
substantial showing threshold is met if "the petitioner demonstrates that reasonable
jurists would find the district court's assessment of the . . . claims debatable or
wrong."  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  Mr. Odum makes no such
showing.  Accordingly, the Court denies a certificate of appealability.

Lastly, the Court concludes that an appeal from this decision cannot be taken
in good faith.  *See* Fed. R. App. P. 24(a).  The Court therefore denies Mr. Odum
leave to proceed in forma pauperis on appeal.  This case is closed.

Accordingly,

26

**IT IS ORDERED** that the petition for a writ of habeas corpus (ECF No. 1) is **DISMISSED WITH PREJUDICE.**

**IT IS FURTHER ORDERED** that the Court **DENIES** Mr. Odum a certificate of appealability and leave to proceed in forma pauperis on appeal.

**SO ORDERED**.

<div style="margin-left:50%">

s/ Linda V. Parker
LINDA V. PARKER
U.S. DISTRICT JUDGE

</div>

Dated: July 28, 2025